COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.:

ROBERT LINDSAY
Plaintiff

vs.

WELLS FARGO BANK, N.A.,AS TRUSTEE FOR CARRIGTON MORTGAGE LOAN TRUST SERIES 2006-NC5 ASSET-BACKED PASS-THROUGH CERTIFICATES
Defendant

**PLAINTIFFS' AMENDED VERIFIED COMPLAINT**

1. The Plaintiff, Robert Lindsay (hereinafter "Plaintiff") is an individual with a usual place of residence at 15 Dawson Street, Boston, Massachusetts,, Suffolk County, in the Commonwealth of Massachusetts.

2. The Defendant Wells Fargo Bank, N.A., as Trustee for Carrington Mortgage Loan Trust Series 2006-NC5., (hereinafter "Defendant") is a financial institution, with a principal business of 8480 Stagecoach Circle. Frederick, MD 21701-4747

3. This Defendant has subjected itself to the long-arm jurisdiction of this Court by having undertaken business and/or transactional business in the Commonwealth of Massachusetts. The Defendant has and continues to utilize the Courts of the Commonwealth of Massachusetts for its purposes and has thereby submitted itself to the long-arm jurisdiction of the Courts of the Commonwealth of Massachusetts.

## FACTS

4. On October 31, 2006, the Plaintiff, entered into a loan refinancing arrangement specifically with New Century Mortgage Corporation, as the "originator", through the execution of_a promissory note made payable specifically to New Century Mortgage Corporation. for $224,000.00

5. On October 31, 2006 the Plaintiff, , entered into and executed a separate contractual Security Instrument agreement ("mortgage") specifically with New Century Mortgage Corporation. whereby the Plaintiff agreed to pledge his property located at 15 Dawson Street, Boston,

Massachusetts,, Suffolk County, in the Commonwealth of Massachusetts. to secure the above referenced promissory note.[1]

6. Under the Massachusetts title theory of mortgage, when Plaintiff undertook a mortgage from New Century Mortgage Corporation, Plaintiff transferred the interest in his property to New Century Mortgage Corporation, as a conveyance of the deed to his land.

7. The mortgage states at page one, paragraph C, that Mortgage Electronic Registration Systems, Inc., ("MERS") was to act solely as the "Lender's" (New Century Mortgage Corporation, Inc, its successors or assigns) "nominee" on the mortgage only. (See Exhibit A).[2]

8. MERS admits that it does not make assignments[3].

9. MERS admits that it only is an electronic registry that is contained within the "MERS System" in which the MERS System purportedly "tracks" off record third party sales of the beneficial interests in a borrower's promissory note, whilst remaining the "lienholder" in the land records.[4]

10. MERS admits that the data that is submitted to the MERS Registry is actually autonomously entered on the MERS System by interested third party "mortgage servicers"

11. MERS admits that it maintains no oversight as to the veracity, or accurateness of these purported off record sales of a borrower's promissory note.

12. The MERS System relies completely upon reference to unauthenticated and unverified electronic records that have not been reviewed under proper evidentiary rules and foundation.

13. MERS theorizes that because MERS remains the "lienholder" while off record third party sales of the borrower's promissory note are purportedly made, successive assignments of the borrower's mortgage are not required.[5]

14. A mortgage is not a "lien interest" under the Massachusetts title theory of mortgages.

15. In fact, Massachusetts is a "title theory" jurisdiction, in that an assignment of mortgage is a transfer of an interest in land that requires an executed writing from a named Grantor to a named Grantee in the chain of title to the Lindsay mortgage, leading from the originator, New Century Mortgage Corporation, to the purported foreclosing entity.(See *U.S. Bank Nat'l Ass'n v. Ibanez* 458 Mass. 637, 649 (2011).[6]

[1] Please see Exhibit A
[2] Please see Exhibit A
[3] Please see Exhibit B, at page 4
[4] Please see Exhibit B, at page 4
[5] Please see Exhibit B, at page 4
[6] Please see Exhibit C

16. On March 21, 2011, a purported "assignment" of the Plaintiff's mortgage is caused to be purportedly executed and recorded by one "Tom Croft", as a purported "Assistant Secretary" of Mortgage Electronic Registration Systems, Inc., as nominee for New Century Mortgage Corporation, Inc., directly to the Defendant Trustee.[7]

17. In fact, New Century filed for bankruptcy protection under Chapter 11 of the United States bankruptcy code on April 02, 2007.

18. In fact, Mr. Croft is a Vice President of "REO" (Real Estate Owned) for Carrington Mortgage Services, not a Vice President for MERS as nominee for New Century, who is a mere "mortgage servicer" (bill collector), not owner of the Lindsay note or mortgage.[8]

19. In fact, New Century Mortgage Corporation, Inc., was entirely divested of all its owned mortgage assets (internally designated as "LNFA" loans), as of June 29, 2007, through a sale to Ellington Capital.[9]

20. In fact, the Defendant Trustee represents the beneficial interests of the Certificateholders for the Defendant Trust's corpus, and thus is bound to follow the mandated terms of the Trust's Governing Documents, (Pooling & Servicing Agreement and Prospectus Supplement).

21. In fact, the Defendant Trust's Governing Document requires that the underlying corpus be conveyed to the Trust by an entity specifically identified as the "***Depositor***" (Stanwich Asset Acceptance Corp.).[10,11]

22. In fact the Defendant Trust's Governing Document requires that the underlying corpus be conveyed to the Trust by an entity specifically identified as the "Depositor" on the "***Closing Date***" (December 16, 2006).[12]

23. In fact the purported "assignment" of the Plaintiff's mortgage on the Suffolk County Registry of Deeds was made by a party other than the Depositor (New Century), well after the Trust's Closing Date (March 11, 2011)[13].

24. In fact, the Plaintiff ***does not*** make any claims under any third party beneficiary theory to the Defendant's contracts with each other contained within the Pooling & Servicing Agreement.

25. In fact the Plaintiff ***does not*** make any claims directly challenging the purported assignment under the "PSA".

26. In fact the Plaintiff is ***not*** affirmatively bringing an affirmative action against the Defendant to enforce the PSA, a contract to which Plaintiff is not a party to.

---

[7] Please see Exhibit D
[8] Please see Exhibit E
[9] Please see Exhibit F, at page 29
[10] Please see Exhibit G
[11] Please see Exhibit H.- at definition of "Depositor"
[12] Please see Exhibit H - at definition of "Closing Date"
[13] Please see Exhibit D

27. In fact Plaintiff was forced to file this action ***in defense*** of the Defendant Trustee's initiation of foreclosure proceedings (as the moving party under G.L. c. 244 § 14), to challenge its standing as a real party in interest.

28. Thus, Plaintiff's challenge lies in the fact that the Plaintiff only specifically contracted with New Century Mortgage Corporation, to specifically grant only to New Century Mortgage Corporation, the power of sale contained within the Plaintiff's mortgage contract to which Plaintiff is clearly a party to.

29. In fact the Defendant Trustee ***was not*** a party to the Plaintiff's mortgage contract, and must demonstrate a clear chain of title leading from the originator (the original party that the Plaintiff contracted with).

30. In fact, the Plaintiff, affirmatively states that the only contract at issue before this court is the Plaintiff's ***mortgage contract***, ***not*** the PSA, and whether the Defendant Trustee, (as a purported assignee of the original lender) is in receipt of a legally valid assignment of the Plaintiff's note and mortgage under the particular requirements of Massachusetts law.

31. In fact, the Plaintiff specifically challenges the standing of the Defendant Trustee, as the moving party under the Massachusetts non-judicial foreclosure statute (G.L. c. 244 § 14), is currently legally possessed of the contractual right of the power of sale that Plaintiff only granted to New Century, which designated MERS to act as New Century's nominee, or for a nominee for a successor in interest from a sale of the beneficial interest in the Lindsay note that New Century that New Century makes.

32. In fact the Plaintiff's challenge before this court is based upon the Trust not following its own mandated terms in its Governing Documents with regards to the sale of the underlying corpus to the trust (specifically with regards to the Lindsay mortgage and note), and therefore the interest of the trust in the Lindsay loan has been vitiated, as the trust maintains a static pool of loans, which cannot be added to after its "Closing Date", as this is designated as a "prohibited transaction" under the terms of the Trust's Governing Documents.

33. Therefore the Plaintiff plausibly pleads that the Defendant Trust's interest in the Lindsay note and mortgage has been vitiated for failure to follow the terms of its Governing Documents, which control.

34. In fact the Plaintiff's challenge before this court is based upon the admission of MERS that its MERS Registry System, failed to take into account the title theory jurisdictional nature of this Commonwealth, as its own internal documentation theorizes that MERS remains the mortgagee for the various subsequent note holders, and that as a "lienholder" it does not need to record subsequent "assignments" of the mortgage.

35. Under the peculiar requirements of Massachusetts law, the mortgage ***does not*** automatically follow the note under the historical decisional case law of this Commonwealth (See *U.S. Bank Nat'l Ass'n v. Ibanez* 458 Mass. 637, 652-653 (2011).

36. In fact, the Plaintiff's challenge before this court is based upon the law of this Commonwealth, that the mortgage may travel independently from the note, and as a transfer of an interest in title to land, and assignment of mortgage itself must be evidenced by an executed writing from the various named Grantors, to the various named Grantees in the chain of title to the Plaintiff's mortgage.

37. In fact, if the purported "assignment "of the Lindsay mortgage relied upon by the Defendant Trustee is suddenly claimed to be merely "confirmatory" of an earlier "assignment", the Massachusetts Supreme Judicial Court has clearly articulated that a "confirmatory" assignment can only "confirm" an actual earlier legally valid "assignment", and the placement of an earlier "effective date" upon the face of any purported "confirmatory" assignment is of no moment if an earlier legally valid assignment does not in fact exist. (See *U.S. Bank Nat'l Ass'n v. Ibanez* 458 Mass. 637, 654 (2011).

38. Plaintiff states that the entirety of the purported evidentiary foundation relied upon by the Defendant Trustee, is based upon unauthenticated, unverified hearsay documentation.

<u>Defendant's Purported Present Claim to Tile of The Plaintiff Mortgage Does Not Establish Clear Title on Behalf of Defendant To Currently Enforce The Power of Sale In The Plaintiff's Mortgage Under G.L. c. 244 § 14</u>

39. Massachusetts adheres to the title theory of mortgage.

40. Thus, an assignment of mortgage is a transfer of an interest in Real Property that must be evidenced by an executed writing from a named Grantor to a named Grantee, see *U.S. Bank v. Ibanez* 458 Mass. 637, 649 (2011).

41. Therefore, *Ibanez* is clearly instructive as to the requirements that establish that the moving party under the Massachusetts non-judicial foreclosure statute (G.L. c. 244 § 14) has established its right and legal standing to do so. [14].

42. Here, based upon the documents associated and filed in relation to the evidentiary foundation" for Defendant's claim to the Plaintiffs' title on the Suffolk County Registry of Deeds, leaves Defendant's claim of ownership of the Plaintiffs mortgage in want, by not providing any legally sufficient evidentiary proffer, submitted under proper evidentiary rules.

[14] "The plaintiffs brought actions under G.L. c. 240 § 6, seeking declarations that the defendant mortgagors' titles had been extinguished and that the plaintiffs were the fee simple owners of the foreclosed properties. As such the plaintiffs bore the burden of establishing their entitlement to the relief sought, *Sheriff's Meadow Found, Inc. v. Bay Courte Edgartown, Inc.* 401 Mass. 267, 269 (1987). To meet this burden, they were required 'not merely to demonstrate better title'..than the defendants possess, but...'to prove sufficient title to succeed in [the] action' Id. See *NationsBanc Mortgage Corp. v. Eisenhauer*, 49 Mass. App.Ct. 727, 730 (2000). There is no question that the relief the plaintiffs sought required them to establish the validity of the foreclosure sales on which their claim to clear title rested." *Ibanez* at 645.

43. Indeed, the Defendant has not provided any proffer that indicates that it has any current right or status as the current "holder" (as that term is historically been identified to include both the holder of the note and owner of the right to exercise rights granted in its security instrument) to enforce the non-judicial power of sale in the Plaintiffs' mortgage under the strict requirements of G.L. c. 244 § 14.

44. At all times since the purported October 23, 2009 "assignment" of the Plaintiff's mortgage caused to be recorded on the Suffolk County Registry of Deeds at Book 47767, Page 38, the Defendant has maintained the outward appearance to the world that it is the current owner of the Plaintiff's mortgage.

45. G.L. c. 244 § 14, provides that only the "holder of the mortgage" at the time of the first publication of the foreclosure auction sale of the mortgagor's premises in a newspaper with sufficient local circulation, is cloaked with the legal standing and authority to foreclose under the strict requirements of G.L. c. 244 § 14.

46. The Defendant's currently scheduled foreclosure auction sale of the Plaintiff's residence, remains based only upon its original publication, claiming that Defendant was the "holder" of the Plaintiffs' mortgage.

47. Left undisclosed, and unaccounted for, is the state of purported "ownership" of the Plaintiffs' underlying debt obligation. See *Eaton v. Federal National Mortgage Association* SJC-11041, and 11-1382 ( Mass Super 2011), McIntyre, J.

48. Based upon MERS admissions in its own internal documentation, the purported "assignment" of the Plaintiff's mortgage from MERS (as nominee for New Century Mortgage Corporation, Inc. ) directly to the Defendant Trustee that it relies upon, is merely a purported representation of an unauthenticated "off record" third party sale of the Plaintiffs' promissory note, from an unauthenticated electronic registry, and not an actual direct "assignment" made by MERS.

49. MERS has never come under any exacting judicial review of its validity under the merits in Massachusetts, nor has MERS validity ever been subject to Appellate review in this state, although there are two cases presently before the Appellate Courts of this Commonwealth reviewing MERS; *Eaton v. Federal National Mortgage Association*, SJC-11041, and *Galiastro v. MERS*, 2011P-0312.

50. MERS will be discussed in greater detail below.

51. Under historical case precedent in this Commonwealth, in order to enforce the harsh non-judicial power of sale in a mortgagor's mortgage contract, there must be unified title in both the borrower's note and mortgage at the time of the first publication of sale. However, this precise issue is currently squarely before the Massachusetts Supreme Judicial Court, in *Eaton v. Federal National Mortgage Association* SJC-11041

52. Defendant has never established under proper evidentiary rules, nor under the requirements attendant to the Uniform Commercial Code, which is codified in this Commonwealth under

G.L. c. 106 §3, that it is currently cloaked with the current legal right and standing to enforce the Plaintiff's promissory note.

53. Defendant has not followed the requirements of G.L. c. 244 § 14 strictly, as it has not identified the true "holder" of Plaintiff's mortgage, and thus any auction held by Defendant concluding in the sale of Plaintiff's residence would be void.

54. Defendant has not provided any evidentiary foundation under proper evidentiary rules that it is entitled to enforce the Plaintiff's promissory note.

55. Defendant is not entitled to enforce the power of sale under G.L. c. 244 § 14.

56. The purported "assignment" of Plaintiff's mortgage suffers from all of the above described fatal defects that go to the very heart of the Defendant's ability to exercise the power of sale in the Plaintiff's mortgage contract.

57. Defendant has not provided any evidentiary foundation under proper evidentiary rules that proves that it is current possession of unified title to the Plaintiff's note and mortgage, in order to enforce the strict requirements of G.L. c. 244 § 14.

<u>New Century Mortgage Corporation Bankruptcy</u>

58. It is indisputable by the Defendant that MERS could not have made any direct assignment of the Plaintiff's mortgage, as MERS ***admits*** that it does not actually make assignments.

59. It is indisputable by the Defendant Trustee, that MERS could not have made any direct assignment of the Plaintiff's mortgage as it ***admits*** that the MERS System merely "tracks" purported off record third party sales of the beneficial interest in the Plaintiff's promissory note.

60. It is also indisputable by the Defendant Trustee that MERS ***admits*** that the only time MERS creates a record to be recorded on the Suffolk County Land Records is to indicate that the Plaintiff's note was purportedly sold to a non-MERS Member.

61. Thus, based upon the above, the Defendant Trustee, by relying upon the record that MERS caused to be recorded at the Suffolk County Registry of Deeds at Book 47767, Page 38, is indisputably asserting that an off record sale of the interest in the Plaintiff's promissory note took place directly from New Century Mortgage Corporation (as the originator) directly to the Trustee on behalf of the Certificateholders on March 21, 2011.

62. It is indisputable by the Defendant Trustee that New Century Mortgage Corporation, Inc. filed for bankruptcy on <u>April 02, 2007</u>.

63. It is also indisputable by the Defendant Trustee that 100% of New Century Mortgage Corporation's business entailed "wholesale origination" of mortgage loans, which supplied mortgages to the secondary "securitized mortgage market", in which New Century's

"ownership‖ interest" was divested approximately *three (3) months after the origination* of the borrowers loan.

64. It is further indisputable by the Defendant Trustee that the only mortgage loans that New Century purportedly still had any "ownership interest" in as of the date of the New Century filing for bankruptcy in April of 2007, were loans specifically identified internally as "Loans Not Financed Anywhere" ("LNFA").[15]

65. It is further indisputable by the Defendant Trustee that New Century Mortgage Corporation was denied DIP financing for its owned "Mortgage Assets".

66. It is further indisputable by the Defendant Trustee that New Century Mortgage Corporation sold the entirety of its owned "Mortgage Assets" pertinent to this action to Ellington Capital on June 29, 2007.[16]

67. Indeed, it is further indisputable by the Defendant Trustee that in the July 2, 2008 Opinion on the New Century Confirmation issued by the Honorable Judge Kevin Carey, he discusses the fact that all of the mortgage assets held by the debtor (New Century Mortgage Corporation, et. al.) at the time of bankruptcy were limited to the LNFA loans, and that a "bidding procedures" protocol had been established, in order for the DIP to divest its interests in all mortgage assets held by the debtor.[17]

68. Thus, DIP status clearly is not availing on New Century Mortgage Company, in order for the Defendant Trustee to claim that it made a direct purchase of the beneifical interest in the Plaintiff's promissory note from New Century Mortgage Corporation in oder for MERS to have purportedly "tracked" the sale of the Lindsay Note directly to the Trustr, as a non-MERS Member.

69. It is further indisputable by the Defendant Trustee that In the Debtor's (New Century, et. al.) April 2, 2007 Asset Purchase Agreement drafted between New Century and Greenwich Capital Financial Products, Inc., at page 4, defines the only mortgage loan assets held by New Century, as LNFA Mortgage Loans.

70. Indeed, it is further indisputable by the Defendant Trustee that in the New Century Mortgage Corporation Bankruptcy hearing on April 3, 2007, at page 57 of the hearing transcript, the Attorney representing New Century Mortgage Corporation states on the record that the "mortgage assets" that New Century Mortgage Corporation had retained with regards to mortgage loans were grouped into categories Loans Not Financed Anywhere (LNFA) and "Residuals", which entailed _cash_ received by New Century from the Securitized Trust Pools, as proceeds from the mortgage backed securities sales. The Plaintiff's loan does not fit either of these criteria.

---

[15] See Exhibit I, at page 57 (Hearing Transcript).
[16] See Exhibit F at page 29 (Amended Disclosure Statement).
[17] See Exhibit J at page 19 (Confirmation Order).

71. Indeed, it is further indisputable by the Defendant Trustee that at Article 8, of the *Asset Purchase Agreement* at page 17, describes the fact that the LNFA loans were sold on a "servicing released" basis, meaning that the purchaser of the "ownership interests" in the LNFA loans, involved a separate transaction from the sale of New Century's servicing platform business asset. Article 8 further recites the fact that up and until the "Servicing Transfer date", New Century would remain the "servicer" for the LNFA loans.[18]

72. Indeed, it is further indisputable by the Defendant Trustee that on April 2, 2007, New Century submitted an Emergency Motion of Debtors and Debtors in Possession for Interim Orders Pursuant to U.S.C. §§ 105, 362 and 364, and Federal Rules of Bankruptcy Procedure 2002, 4001, and 9014(A) Approving Debtor In Possession Financing.[19]

73. Indeed, it is further indisputable by the Defendant Trustee that at Page 6, Line 16 of the above referenced Emergency Motion submitted by New Century, states as follows: The need for stability is particularly critical since the Debtors largely operate a servicing business"

74. Indeed, it is further indisputable by the Defendant Trustee that at page 7, Line 18 of the above referenced Emergency Motion submitted by New Century, states as follows: "This Motion does not seek the approval of a large DIP loan, certainly not in comparison to the billions of dollars in financing the Debtors utilized [prepetition. The DIP loan proposed herein is a scaled down facility designed to allow the Debtors to quickly auction their business and to maintain these operations in a stable condition pending the completion of these sales". (See Exhibit L)

75. Indeed, it is further indisputable by the Defendant Trustee that at page 8, Line 20, of the above referenced Emergency Motion submitted by New Century, states as follows: "This is not a defensive DIP loan proposed by a group of existing pre-petition lenders. Rather, the proposed DIP loan is a stand-alone facility provided by one lender, CIT, as an independent business matter, and by one other member of the DIP lending syndicate, Greenwich, as an independent loan and in order to help finance the Debtors as an ongoing concerns so that Greenwich can make a bid for certain of the Debtors' assets". (See Exhibit L)

76. Indeed, it is further indisputable by the Defendant Trustee that at page 9, Line 24, of the above referenced Emergency Motion submitted by New Century, states as follows: "Tranche A is a revolving loan facility with a borrowing base keyed to a variety of Debtors' unencumbered assets—(i) a pool of mortgage loans with a face principal amount of approximately $173 Million, (ii) various residual interests in mortgage loan securitization trusts (i.e. mortgage backed securities), (iii) state and Federal Income Tax refunds that Debtors are seeking in an amount of $113 Million, (iv) a limited partnership interest in Carrington Investment Partners (US), LP ("Carrington"), and (iv) the Debtors' rights to *service* mortgage loans for a variety of securitization trusts and third party wholesale loans purchased on mortgage loans originated by Debtors and subsequently sold to these purchasers". (See Exhibit L)

---

[18] See Exhibit K at page 17 (Asset Purchase Agreement).
[19] See Exhibit L (Emergency Motion).

77. Indeed, it is further indisputable by the Defendant Trustee that at page 10, Line 25, of the above referenced Emergency Motion submitted by New Century, describes very clearly that the Tranche B piece, deals solely with DIP financing to solely maintain the New Century servicing business as a DIP. (See Exhibit L)

78. Indeed, it is further indisputable by the Defendant Trustee that at on February 2, 2008, New Century submitted an Amended Disclosure Statement for the Joint Liquidation of the Debtors and The Official Committee of Unsecured Creditors. See Exhibit F

79. Indeed, it is further indisputable by the Defendant Trustee that at on page 29, of the above referenced Amended Disclosure Statement submitted by New Century, at Section III(C)(6) Asset Sales, discusses the events that transpired, with regards to New Century's divestment of its "ownedǁ assets" (as opposed to its servicing assets). See Exhibit F

80. Indeed, it is further indisputable by the Defendant Trustee that at on page 29, at Subsection (a), of Section III(C)(6), describes "The First Sale of LNFA and Residuals". See Exhibit F

81. Indeed, it is further indisputable by the Defendant Trustee that at on the above referenced section very clearly describes that there were approximately only 2,000 residential mortgage loans "owned" by New Century. "These loans, either because of quality or timing, were not subsequently the subject of a repurchase transaction and are generally referred to as "LNFA" or "loans not financed anywhere". Other loans in this pool were originated by the Debtors but were never financed under a repurchase agreement or disposed of in a loan sale in the secondary market. The Mortgage Asset Bid Procedures Motion Proposed that Greenwich' Agreement to purchase the Mortgage Assets for $50 Million would serve as the stalking horse bid". See Exhibit F

82. Indeed, it is further indisputable by the Defendant Trustee that at on **page 30**, at Subsection (a), of Section III(C)(6), describes "The First Sale of LNFA and Residuals" states the following: "On April 12, 2007, the Bankruptcy Court entered an Order approving the Mortgage Assets Bid Procedures, including a breakup fee of $945,000 to be paid to Greenwich in the event that Greenwich was not the successful bidder for the mortgage assets [NCMC BK Docket No. 226]. The auction for the Mortgage Assets was concluded on May 2, 2007. After nine rounds of bidding, the winning bidder for the Mortgage Assets was Ellington Capital Management Group, L.L.C. on behalf of its clients' funds ("Ellington"). NCFC, and NC Asset holding (together the ("Mortgage Asset Sellers"), on one hand and Ellington, on the other hand, entered into an Asset Purchase Agreement ("the Ellington Agreement") dated as of May 2, 2007 and approved by the Bankruptcy Court by Order dated May 7, 2007 ("the Mortgage Asset Sale Order"), pursuant to which Ellington agreed to purchase the Mortgage Assets for approximately $58.0 Million [NCMC BK Docket No. 566]ǁ (See Exhibit F)

83. Indeed, it is further indisputable by the Defendant Trustee that IT IS stated at page 30: "On May 18, 2007, the sale of the Mortgage Assets to Ellington Closed. After giving effect to certain closing adjustments, the net purchase price paid by Ellington was approximately $57.9 Million, including approximately $2.6 Million deposited by Ellington into an escrow

account to indemnify Ellington for claims made under the Ellington Agreement, and payment of the Greenwich break-up fee." (See Exhibit F)

84. Indeed, it is further indisputable by the Defendant Trustee that at on page 30 recites that on June 25, 2007, the Mortgage Asset Sellers and Ellington entered into a Supplement No. 1 to the original Ellington agreement (Supplement 1), pursuant to which Ellington agreed to purchase certain additional mortgage loans originated by the Mortgage Asset Sellers ("the Additional Mortgage Loans") for approximately $4.4 Million. The Bankruptcy Court entered an order approving this Additional Mortgage Loan Sale on June 27, 2007 [NCMC BK Docket No. 1715]. The closing of this sale occurred on June 29, 2007. (See Exhibit F)

85. Indeed, it is further indisputable by the Defendant Trustee that at on page 34, of the above document, at subsection (f.) "Sale of Additional LNFA (Including Ohio Loans), very clearly describes the sale of the remaining 46 Mortgage Loan Assets held by New Century, that were subject to "complications related to the State of Ohio, or because work was required to clear title to the loans." 41 of these remaining 46 loans were purchased by GRP Financial Services Corp. ("GRP"), and the purchase was approved by the Bankruptcy Court on January 9, 2008, [NCMC BK Docket Nos. 4361, 4556]. (See Exhibit F)

86. Therefore, based upon the New Century Bankruptcy docket, it is further indisputable by the Defendant Trustee that ALL of the Mortgage Assets held by the DIP were sold and completely divested as of January 9, 2008. And in fact, save the 46 "Ohio loans", the New Century Estate was completely divested of all other loans as of June 29, 2007.

87. Therefore, it is further indisputable by the Defendant Trustee that the Defendant(s) legal position with regards to obtaining a legally valid "assignment" of the Debtor's note and mortgage, which purported sale of the Lindsay promissory note directly from New Century Mortgage Corporation to the Defendant Trustee that was purportedly "tracked" by MERS, as a result of the entry of unauthenticated data submitted by an interested third party mortgage servicer (Carrington) that purports to have taken place on March 21, 2011 is legally impossible, and under information and belief was willfully submitted by the enterprise in order to deceive this court as to the Defendant(s) trust's true status with regards to is standing as a real party in interest to be able enforce the Debtor's note and its security interest.

88. The New Century purported assignment issuel was also addressed in *New Century Mortgage v. Braxton* 18 LCR 36 (2010).[20]

89. The *Braxton* case involved an action to reform two mortgages given to New Century by Shauann N. Braxton and Kenya D. Nickerson-Braxton. The court found that: "In April of 2007, New Century TRS Holdings, Inc., of which the plaintiff (New Century Mortgage Corporation) is an affiliate or subsidiary, filed chapter 11 bankruptcy proceedings. Pursuant to those proceedings by order of the Bankruptcy Court, on August 1, 2008, a liquidating trust was created with Alan M. Jacobs as trustee, and all of New Century's Assets were distributed to the liquidating trust." *Braxton* at LCR 38.

[20] See Exhibit M

90. The *Braxton* court went on to discuss the challenge to New Century's standing by the Defendant in that matter: "On March 31, 2009 New Century executed and recorded a document purporting to assign the First Mortgage to Consumer Solutions REO, with an effective date' of June 2, 2007‖ *Braxton* at LCR 39.

91. Further, the *Braxton* court stated: "All of the recorded assignments out from New Century took place during the pendency of the bankruptcy proceedings in Delaware (which commenced in April of 2007). The terms of the August 13, 2009 Order of this court [Land Court] required the plaintiff (New Century) to show how New Century could assign the subject mortgages, or maintain this action, in light of the bankruptcy proceedings....‖ *Braxton* at LCR 39.

92. In *Braxton*, New Century never proffered any of the court requested indicia to provide an evidentiary foundation to support under what legal authority it could make an assignment of any mortgage loan while it was in bankruptcy, precisely the issue before this court, and this case was dismissed as against New Century's claims.

93. Like *Braxton*, Defendants here seek to solely rely upon a fatally defective, and under information and belief fraudulent drafted and executed, purported assignment of Plaintiff's mortgage, to provide them with a purported colorable claim of standing as a real party in interest to be able to enforce the Plaintiff's promissory note under G.L. c. 106, and its security instrument (mortgage) under Massachusetts conveyancing and real property laws, and G.L. c. 244 § 14, and G.L. c. 183 § 21.

Mortgage Electronic Registration Systems, Inc.

94. MERS is clearly defined in Plaintiff's mortgage as acting "solely as nominee for the lender or for the successors or assignees from an assignment that the lender (New Century) makes, as MERS is merely a purported "nominee mortgagee"[21]

95. MERS admits in its own Rules that it can only act as "nominee" for an active Dues Paying Member.[22]

96. Stanwich Asset Acceptance Corp. as the "Depositor" who is the only authorized entity to convey the Lindsay note and mortgage to the Trust as part of the Trust's corpus, under the terms of the Governing Documents.[23]

97. The Depositor, Stanwich Asset Acceptance Corp. is not now, nor has ever been, an active dues paying Member of MERS.

98. MERS admits, in its own internal documentation that MERS only "tracks off record third party sales" of the beneficial interests in the Plaintiff's promissory note, and the attendant

[21] Please see Exhibit A
[22] Please see Exhibit N at Rule 1, Section 1
[23] Please see Exhibit G

mortgage servicing rights, based only upon electronic data supplied by its active dues paying members. [24]

99. MERS admits, in its own internal documentation that MERS does not make electronic assignments. [25]

100. MERS admits, in its own internal documentation that MERS can only act for one of its active dues paying members. [26]

101. MERS admits, in its own internal documentation that MERS admits that there is a clear distinction between the REGISTRATION of loans on the "MERS System, and the RECORDATION that takes place in local County Registries of Deeds. [27]

102. Thus MERS is an electronic database, and any purported document produced from the MERS System database, would need to meet proper evidentiary foundational rules for authentication.

103. As an assignment of mortgage is a transfer of an interest of land (independent of the transfer of the right to enforce the Lindsay promissory note), there must be present executed writings from the named Grantors to the named Grantees in the chain of title to the Lindsay mortgage.

104. Defendant's purported chain of title omits numerous named and unnamed parties involved in the chain of title to the Lindsay mortgage.

105. Defendant solely relies upon its purported receipt of the recorded purported Assignment of Plaintiff's mortgage directly from a chain of title that includes "MERS", purportedly acting for New Century Mortgage Corporation or its successor or assign.

106. The Defendant Trustee has not produced any documentation that would provide any evidentiary foundation that MERS was acting for any successor or assign of New Century Mortgage Coporation, Inc, as described in the Plaintiff's mortgage contract.

107. The Defendant Trustee has not produced any documentation that would provide any evidentiary foundation that MERS was acting for any successor or assign of New Century Mortgage Coporation, Inc, as required under the terms of the Defendant Trust's Governing Documents

108. Additionally, as these purported records relied upon by the Defendant Trustee involve the MERS tracking System, such records would be derived from an electronic database, the continuity, integrity, working order, and procedures and protocol attendant to the subject

[24] See Exhibit B at page 4
[25] See Exhibit B at page 4
[26] See Exhibit B at page 4
[27] See Exhibit B at page 4

database would also need to meet proper evidentiary foundational rules attendant to authentication.

109. There is no reliability of such database, as MERS members themselves, populate the data for these purported third party off record transaction that purportedly are "tracked" by the MERS System, without any oversight by MERSCORP, or the MERS System..

110. Defendant has not set forth any evidentiary foundation in support of the assertion that MERS has accurately relied upon electronic data supplied by others that is legally sufficient to support the Defendant's assertion that MERS actually "tracked" a legally sufficient "off record sale " (as well as under the requirements of the Trust's Governing Documents) of the Plaintiff's promissory note from New Century Mortgage Corporation to the Defendant Trustee on **March 21, 2011** , as MERS does not make electronic assignments.[28]

111. MERS admits that it does not maintain any ownership rights in a borrower's mortgage or any beneficial interest in a borrower's promissory note, thus the statement in the March 21, 2011 purported "assignment" reciting that ***it*** also assigned the "note or notes" described within the mortgage is a legal impossibility.

112. MERS literature theorizes that because MERS remains the "lienholder" it does not have to RECORD subsequent changes of ownership of the security instrument to reflect the underlying "off record sales" of the borrower's promissory note. [29]

113. MERS business model failed to contemplate the title theory jurisdictional nature of this Commonwealth. Therefore, in Massachusetts a mortgagee does not hold any "lien interest" in the Security Instrument (mortgage) associated with the underlying promissory note.

114. Massachusetts is a title theory jurisdiction, and therefore when Plaintiff entered into and executed the Security Instrument with Homecomings Financial, pledging the property located at 15 Dawson Street, Boston, Massachusetts as security for the promissory note made specifically payable to Homecomings Financial, Plaintiff therefore, did not cause a "lien" to be placed upon his title at the Sufffolk County Registry of Deeds, rather Plaintiff actually deeded the property to Defendant, subject only to defeasance upon his satisfaction of the underlying promissory note, or his exercise of his statutory right of redemption.

115. As an initial matter, in order for MERS to clear the hurdle of a hearsay objection to its purported "tracking" representational "data" (which the Plaintiff hereby affirmatively asserts), it would have to be established that this "tracking information" is either *not hearsay*, or fits within *some exception to the hearsay rule.*

116. If MERS claims that this "tracking" information is a "business record kept in the ordinary course", G.L. c. 233 § 78, provides for the admissibility of ordinary business records.

[28] New Century Mortgage Corporation had filed for bankruptcy as of April 02, 2007.

[29] See Exhibit B at p. 4

117. The admission of these type records in civil cases imports the necessary preliminary findings above, by the Judge; see *Sawyer & Co. v. Southern Pacific* Co. 354 Mass. 481 (1968).

118. MERS' "statements" in its documents, as to what purportedly takes place in a purported "tracking" of an off-record" assignment" of a borrower's note is purportedly derived by way of reference to (and directly from) "electronic data" provided by unnamed third parties..

119. Said data is purportedly retrieved from electronically stored information stored in various computers and their attendant databases. Thus as a secondary analysis to the above paragraphs related to MERS' ability to claim that its representations are "business records", MERS electronic data purporting to represent the electronic "tracking" of the purported "off record" sales of the Plaintiff's promissory note (and mortgage), must be properly further Authenticated under proper evidentiary Rules.

120. There has been no proffer indicating the proper working order of the computers purportedly storing the purported "electronic tracking data" related to the beneficial Interest in the Plaintiff's promissory note on the MERS electronic Registry database, or precisely how this data is used or relied upon in the MERS System Registry database "tracking" System specifically related to the Plaintiff's loan, nor the precise procedures and protocols relied upon by MERS for ensuring the reliability and security of such "electronic tracking data" relied upon, See Generally *In Re Vinhnee* 336 B.R. 437 (B.A.P. 9th Cir. 2005).

121. Because MERS is an electronic database, there needs to be separate authentication of the purported underlying data attendant to the electronic "tracking" of purported "off record sales" of the "Beneficial Interests" in the Plaintiff's promissory note.

122. Such examination must be subject to the Plaintiff's hearsay exception, and two levels of Plaintiff's challenge to authentication including; 1) the physical documents that the MERS System purportedly relied upon as the "tracking indicia" establishing that in fact the Plaintiff's promissory note was sold from Homecomings Financial under the requirements attendant to the Trust's Governing Documents, and 2) to show that:

(1) The business uses a computer.

(2) The computer is reliable.

(3) The business has developed a procedure for inserting data into the computer.

(4) The procedure has built- in safeguards to ensure accuracy and identify errors.

(5) The business keeps the computer in a good state of repair.

(6) The witness had the computer readout certain data.

(7} The witness used the proper procedures to obtain the readout.

(8) The computer was in working order at the time the witness obtained the readout.

(9) The witness recognizes the exhibit as the readout.

(10) The witness explains how he or she recognizes the readout.

(11) If the readout contains strange symbols or terms, the witness explains the meaning of the symbols or terms for the trier of fact.

123. Therefore, based upon the present proffer on the Suffolk Registry of Deeds it is a legal impossibility for MERS to have acted as "nominee" for New Century Mortgage Corporation, Inc. on any purported "assignment, to the Defendant Trustee on March 21, 2011

124. As a result of the above, the Plaintiff has absolute standing to challenge the legal standing of Defendant who seeks to enforce the power of sale originally given by Plaintiff solely to New Century Mortgage Corporation, through MERS as its nominee.

Defendant Carrington Mortgage Loan Trust Series 2006-NC5 Asset-Backed Pass-Through Certificates

125. The Defendant Trust, is a New York Express business Trust that was formed by the "Depositor" according to the terms of its Governing Documents, the Pooling and Servicing Agreement and Prospectus Supplement [30]

126. As the Defendant is a Business Trust, in order to enjoy its existence and circumvent Massachusetts statutory requirements attendant to the corporate form, as well as receive favorable tax treatment under Section 860D of the United States Tax Code, as a Real Estate Mortgage Investment Conduit ("REMIC"), the Defendant Trust must strictly follow the terms of its Governing Documents with regards to the sale of the corpus to the Trust.

127. The terms of the Defendant Trust's Governing Documents, state that an entity defined as the "Depositor" will establish the Trust with respect to 2006-NC5 on the "closing date".

128. The terms of the Defendant Trust's Governing Documents define the <u>Depositor</u> as <u>Stanwich Asset Acceptance Company, L.L.C.</u>[31]

129. The terms of the Defendant Trust's Governing Documents define the <u>Closing Date</u> as **<u>On or about December 19, 2006</u>**[32]

---

30

31 Please see Exhibits G and H, as well as the attached data CD, which contains the full documents of each exhibit.

32 Please see Exhibits G and H, as well as the attached data CD, which contains the full documents of each exhibit.

130. The Terms of the Trust clearly state a fixed amount of loans (5,361) that make up the corpus of the Trust, with a specific principal balance of $1,216,634,845 as of the cut-off date.[33]

131. The terms of the Trust define the "Cut Off Date" as December 1, 2006.[34]

132. The Terms of the Trust clearly state that the Depositor will deliver loans at the Closing Date that will not vary +/- 5% of the makeup of the loan pool as of the cut off date.[35]

133. The Defendant Trustee purports **to** rely upon **a** purported "assignment" which purports to sate that the Defendant Trust received a direct "assignment from Mortgage Electronic Registration Systems Inc, who purports to have acted as "nominee" for New Century Mortgage Corporation (the Originator) on March 21, 2011.

134. MERS admits that it does not make assignments, but merely tracks the off record sales of the beneficial interest in a borrowers promissory note.

135. MERS admits that it only creates "assignments" to reflect that the borrower's promissory note was sold to a non-MERS member.

136. Thus the document that the Defendant Trustee seeks to rely upon to provide it legal standing to enforce contractual rights that the Plaintiff only contractually granted to New Century Mortgage Corporation, purports to indicate that that a purported off record third party sale of the Lindsay note took place from New Century Mortgage Corporation directly to the Defendant Trust on March 21, 2011, which is a non MERS Member.

137. Thus, based upon MERS admissions, the document that the Defendant Trustee seeks to rely upon to provide it legal standing to enforce contractual rights that the Plaintiff only contractually granted to New Century Mortgage Corporation, purports to indicate that a purported off record third party sale of the Lindsay note took place from New Century Mortgage Corporation directly to the Defendant Trust on March 21, 2011, which is a non MERS Member, and therefore the "mortgage followed the note".

---

[33] Please see Exhibit O

[34] Please see Exhibit G

[35] Please see Exhibit O, "Investors should note that the mortgage pool as described in this prospectus supplement has an aggregate principal balance of approximately $1,216,634,845. However, on the closing date the depositor will deliver mortgage loans with a smaller aggregate principal balance, subject to a permitted variance of plus or minus 5%. It is expected that the characteristics of the mortgage loans delivered on the closing date will not materially differ from the characteristics of the mortgage loans described in this prospectus supplement. All calculations and percentages shown in this prospectus supplement are based on the mortgage pool as described herein".

138. Under the peculiar requirements of Massachusetts law, the mortgage ***does not*** automatically follow the note under the historical decisional case law of this Commonwealth (See *U.S. Bank Nat'l Ass'n v. Ibanez* 458 Mass. 637, 652-653 (2011).

139. Thus, based upon MERS admissions, the document that the Defendant Trustee seeks to rely upon to provide it legal standing to enforce contractual rights that the Plaintiff only contractually granted to New Century Mortgage Corporation, purports to indicate that a purported off record third party sale of the Lindsay note took place from New Century Mortgage Corporation directly to the Defendant Trust on March 21, 2011

140. New Century Mortgage Corporation had divested itself of all Mortgage Assets on June 29, 2007.

141. Should the Defendant Trustee seek to rely upon the PSA itself to assign the Plaintiff's mortgage to the Defendant Trust, its Governing Documents only authorized one entity to make the sale of the Plaintiff's mortgage and note to the Trust, the "Depositor".

142. In, *U.S. Bank Nat'l Ass'n v. Ibanez* 458 Mass. 637, 651(2011), the SJC stated, "the executed agreement that assigns the pool of mortgages, with a schedule of the pooled mortgage loans that clearly and specifically identifies the mortgage at issue as among those assigned may suffice to establish the trustee as the mortgage holder, However, there must be proof that that the assignment was made by a party that itself held the mortgage".[36]

143. "Even if there were an executed trust agreement with the required schedule, U.S. Bank failed to furnish any evidence that the entity assigning the mortgage –Structured Asset Securities Corporation [Depositor] ever held the mortgage to be assigned [to the trust]" *Ibanez* at 650.

144. There has been no loan schedule proffered by the Defendant Trustee, nor has the Defendant Trustee provided any evidence that the Depositor ever held the Lindsay note and mortgage it was purportedly assigning in the PSA.

145. Therefore, the Defendant Trustee has not proffered any legally competent evidence that it has the current legal standing to assert control of the Lindsay note or mortgage as part of the underlying corpus of the Defendant Trust, as the conveyance of the Lindsay note and mortgage were not made under the mandated requirements of the terms of the Trust's Governing documents, and therefore any purported interest in the Lindsay note or mortgage by the Trustee on behalf of the Certificate holders has been vitiated.

[36] "Wells Fargo submitted a schedule that it represented identified the loans assigned in the PSA, which did not include property addresses, names of mortgagors, or any number that corresponds to the loan number......Wells Fargo contends that a loan with the LaRace property and city is the LaRace mortgage loan because the payment history and loan amount matches the LaRace loan's Zip Code" *Ibanez* at 644-645

## CAUSES OF ACTION

### Count I – Injunctive Relief

146. Plaintiff repeats and realleges all paragraphs above as set forth fully above herein

147. On information and belief, and predicated upon Defendants own documents recorded in the Suffolk County Registry of Deeds, Defendant does not have the current legal authority to act pursuant to the power of sale in Plaintiffs' mortgage contract, because Defendant(s) could not legally receive a legally valid assignment of Plaintiffs' mortgage contractual rights derived from the originating entity and all intermediary parties, to it.

148. On information and belief, and predicated upon Defendants own documents recorded in the Suffolk County Registry of Deeds, Defendant does not have the current legal authority to act pursuant to the power of sale in Plaintiffs' mortgage contract, because Defendant(s) could not legally receive a legally valid assignment of Plaintiffs' mortgage contractual rights from MERS, as MERS does not actually make assignments, and therefore there has been no authentication of the data that MERS purportedly relied upon to "track" the "off record sale" of the Beneficial Interest in the Plaintiff's Promissory Note.

149. The Defendant has not produced the original promissory note executed by the Plaintiff, nor has the Defendant provided an evidentiary foundation to support the intermediary absolute sales of such promissory note as required under the Defendant trust terms stated within its Governing Documents, and purportedly "tracked" by MERS..

150. On information and belief, the Legal Notice provided to Plaintiff pursuant to G.L. c. 244 § 14 is not valid because at the time it was sent, Defendant was not in possession of the contractual right of the power of sale in the Plaintiff's mortgage, thus the Defendant could not be a "holder" of Plaintiffs' mortgage as required under G.L. c. 244 § 14, and therefore Defendant had no power to act as mortgagee under the statute. See *Bottomly v. Kabchinick*, 13 Mass.App.Ct. 480, 434, 434 N.E.2d 667 (1982).

151. Defendant(s) cannot conduct a valid foreclosure auction of Plaintiffs' residence under Massachusetts' law.

152. The Defendant Trustee's foreclosure, if allowed to proceed would cause Plaintiff irreparable harm. "real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the realm of the chancellor." *K-Mart Corp. v. Oriental Plaza, Inc.* 875 F.2d 907, 914 (1st Cir.1989).

153. The balance of the hardships tips decidedly in favor of Plaintiff, because absent injunctive relief, he will lose his residential property, and will lose the rights to raise claims and defenses to the purported enforcement of the mortgage set forth hereunder.

154. The public interest is furthered by the granting of the requested preliminary injunction, as it acknowledges the importance of maintaining a home as the central component of the family and its safety, shelter and nourishment.

155. The Defendant Trustee will suffer no irreparable harm from the issuance of the requested preliminary injunction, as purely economic harm is not deemed irreparable.

156. Absent injunctive relief, there is a substantial likelihood that neither The Defendant Trustee, nor any other Defendant(s) would conform its conduct in accordance with the mandates of Massachusetts law, to be able to legally conduct the foreclosure auction of Plaintiffs residential property under the strict requirements of G.L. c. 244 § 14.

157. Plaintiff respectfully seeks preliminary and permanent injunctive relief from this court, to enjoin the currently scheduled foreclosure auction of his residence, based upon the entirety of the above numbered paragraphs.

Count II –Declaratory Judgment That Defendant Lacks The Legal Standing To Enforce The Power of Sale Clause In The Plaintiff's Mortgage Contract

158. Plaintiff ***does not*** seek any recovery under any third party beneficiary theory to the Defendant Trustee's PSA.

159. Plaintiff ***does not*** challenge the assignment of his mortgage under any third party beneficiary theory to the Defendant Trustee's PSA.

160. Plaintiff states that the Defendant Trustee was not an original party to Plaintiff's mortgage contract.

161. Plaintiff only contractually entered into an agreement with, and only contractually granted the power of sale in his mortgage contract to; New Century Mortgage Corporation.

162. The Defendant Trustee currently seeks to enforce the contractual right of the power of sale for breach of condition under G.L. c. 244 § 14, that Plaintiff only contractually granted to New Century Mortgage Corporation.

163. The Defendant Trustee has not produced an evidentiary foundation that it currently holds an ownership interest in the Plaintiff's original promissory note, through production of the original paper instrument.

164. As the Defendant Trustee is not the original Lender or party to the Plaintiff's Security Instrument for the Plaintiff's underlying debt obligation, the Defendant Trustee must provide an evidentiary foundation, under proper evidentiary rules, independent of the promissory note, that traces the ownership of the Plaintiff's mortgage from the originating Lender to it, as the Defendant Trustee is not an original party to the Plaintiff's mortgage contract.

165. The Defendant Trustee solely relies upon a March 21, 2011 purported direct assignment from MERS, as nominee for New Century Mortgage Corporation to it, to establish its standing to enforce contractual rights that Plaintiff specifically granted to only New Century Mortgage Corporation.

166. The Plaintiff has provided documentary evidence that MERS admits that it does not make assignments.

167. The Plaintiff has provided documentary evidence that MERS admits that its MERS System merely tracks purported off record purported sales of the Plaintiff's promissory note.

168. The Plaintiff has provided documentary evidence that MERS admits that its business model is predicated upon MERS remaining the "lienholder" on the land records while these off record third party sales of the beneficial interests in a borrower's promissory note is made, and thus there is no need for further recordation of assignments of mortgage because MERS remains the lienholder for the purchasers of a borrower's promissory note.

169. Under the specific requirements of Massachusetts title theory of mortgages, the historical decisions in this Commonwealth state that the mortgage ***does not*** automatically follow the note.

170. In Massachusetts a mortgage is not a "lien" on a borrower's title, rather the borrower actually conveys title to the lender, subject to defeasance upon the satisfaction of the underlying debt, or the borrower's exercise of its statutory right of redemption under G.L. c. 244 § 18.

171. The Defendant Trustee, therefore relies upon a record generated from the MERS System that stands for the proposition that the MERS System tracked an off record sale of the Plaintiff's promissory note directly from New Century Mortgage Corporation to the Defendant Trustee (as a non-MERS Member) on March 21, 2011, and therefore the Plainff's mortgage "followed".

172. The Plaintiff has provided documentary evidence that New Century Mortgage Corporation had completely divested itself of all owned "mortgage assets" as of June 29, 2007.

173. The Plaintiff has also provided documentary evidence that under the specific terms of the Defendant Trust's Governing Documents, the Plaintiff's mortgage loan was mandated to be conveyed to the Trust by an entity clearly defined as the Depositor (Stanwich Asset Acceptance Corp.) , on or before the "closing date" of December 16, 2006.

174. Thus the purported assignment that the Defendant Trustee seeks to rely upon is an artifice that has no legal significance because it is legally impossible.

175. Should the Defendant Trustee seek to claim that the recorded assignment is merely "confirmatory" of an earlier assignment, the Massachusetts Supreme Judicial Court has clearly spoken to the fact that an assignment of mortgage claimed to be "confirmatory" in nature can only confirm an actual earlier legally valid assignment.

176. Based upon the entirety of the foregoing, and based upon the lack of any legally sufficient legal foundation that would support the Defendant Trustee's naked assertion that it currently enjoys the legal standing to enforce the contractual right of the power of sale in the Plaintiff's mortgage that was only specifically granted to New Century Mortgage Corporation, the Plaintiff respectfully requests that this court make a declaratory judgment that the Defendant Trustee seeks to enforce non-existent contractual rights, and does not have

the legal right or legal standing to proceed with the non-judicial foreclosure of the Plaintiff's residence as it has not followed G.L. c. 244 § 14 strictly, and thus is an improper party under this statute to foreclose on the Plaintiff's residential home.

Count III - Violation of Chapter 93A and Its Implementing Regulations

177. Plaintiff repeats and realleges all paragraphs above as if set forth fully herein.

178. Defendants have violated G.L. c. 93A and its implementing regulations by utilizing terms and practices that were unfair, deceptive, and/or unconscionable. These violations included, without limitation:

179. Creating the appearance on the Land Records of the Suffolk County Registry of Deeds related to the Plaintiff's property that legally valid "assignment(s)" took place, in order for a legally valid foreclosure auction to take place under G.L. c. 244 § 14.

180. Such assertions by Defendant to Plaintiff were made with scienter that they are legally untrue, and legally incorrect.

181. Due to Defendant's assertions, Plaintiff was led to believe that Defendant was the unquestioned owner of his mortgage, and based upon these wrongful misrepresentations, Plaintiff acted to his detriment

182. Defendant's conduct was willful or knowing within the meaning of c. 93A, § 2.

183. Plaintiff was injured and suffered damages by virtue of these violations.

184. Plaintiff's damages include; without limitation,

a. that his credit rating has been adversely affected based upon the Defendant Trustee's attempted collection of an unenforceable debt.

b. The legal costs attendant to defending the attempted enforcement of non-existent contractual rights to enforce the power of sale clause in the Plaintiff's mortgage contract by the Defendant Trustee.

c. The Defendant Trustee's slander to Plaintiff's title, through the public recordation of a document that purports to be an "assignment", but in fact is a legally inoperative record that has no significance in the transfer of title to the Lindsay real property.

185. The demand letter requirement under c. 93A § 9 is obviated as to the Defendant Trust, or the other as yet potential unnamed Defendant(s) because Plaintiff was forced to file an

underlying action defensively to asserting his claims as to the insufficiency to the Defendant Trustee's standing against the foreclosure action being initiated by the moving party Defendant Trustee under G.L. c. 244 § 14.

186. The demand letter requirement under c. 93A § 9 also does not apply to the Defendant Trust, or the other Defendant(s), because the Defendant Trust, and/or Defendants do not maintain a place of business and/or do not keep assets within the Commonwealth.

187. A mortgage is not an "asset" for the purposes of requiring a G.L. c. 93A demand letter, because Massachusetts decisional case law has found that a mortgagor retains ownership of the home even as against the mortgagee while the mortgagor maintains possession of the premises.[37]

188. Plaintiff seeks all damages allowable for these transgressions by Defendant, and will prove damages at trial.

Count IV – Slander of Title

189. Plaintiff repeats and realleges all paragraphs above as if set forth fully herein.

190. "Slander of title is a tort action for damage to real property resulting from interference with title to real estate by falsehoods which although not personally defamatory, cause the Plaintiff pecuniary loss through interference with....dominion over his property" *Salloom v. Lister* 2004 WL 1836027, 18 Mass L. Rptr. 165 at *2 (Mass Super. 2004).

---

[37] *"So long as it remains in possession, the mortgagor is regarded as the real owner"*, Way v. Mullett, 143 Mass. 49 (1886), *"and it* [mortgagor] *retains all incidents of ownership, not only as to all the world, but as to the mortgagee as well"* Aragona v. Parrella, 325 Mass. 583 (1950). *"Prior to breach of the statutory condition, see G.L. c. 183, § 20, the mortgagee holds bare legal title to the property subject to defeasance on the mortgagor's performance of the obligation secured by the mortgage.* Perry v. Miller, 330 Mass. 261 (1953). Pineo v. White, 320 Mass. 487 (1946). *"It is only for the purpose of securing the debt that the mortgagee is to be considered owner of the property"*. Boston v. Quincy Mkt. Cold Storage & Warehouse Co., 312 Mass. 638, 649 (1942). Krikorian v. Grafton Co-op. Bank, 312 Mass. 272, 274, (1942). *"(A)ll the statutes upon the subject (i. e., mortgages) are to be so construed; and all rules of law, whether administered in law, or in equity, are to be so applied, as to carry these objects into effect."* Ewer v. Hobbs, 5 Metc. 1, 3 (1842). *"Literally, in Massachusetts, the granting of a mortgage vests title in the mortgagee to the land placed as security for the underlying debt. The mortgage splits the title in two parts: the legal title, which becomes the mortgagee's, and the equitable title, which the mortgagor retains"*. See Vee Jay Realty Trust Co. v. DiCroce, 360 Mass. 751, 753 (1972); Negron v. Gordon, 373 Mass. 199, 204 (1977). *"The purpose of vesting legal title in the mortgagee is to secure the debt owed by the mortgagor."* Krikorian v. Grafton Co-op. Bank, 312 Mass. 272, 274 (1942). Negron v. Gordon, supra 373 Mass. at 204. ***Although a mortgage vests title, that title is defeasible and is an off-shoot of the underlying debt***. *"Neither the breach of the statutory condition nor a lapse of time subsequent thereto alters the rights of the parties in relation to the property."* 28 M.E. Park & D. D. Park, Conveyancing, § 351 (1968). Goodwin v. Richardson, 11 Mass. 469, 472 (1814).

191. "In Massachusetts, a person is liable for slander of title, i.e. injurious falsehood", if he or she (a) publishes a false statement, (b) that harms the interests of another; (c) with the intent to harm the interests of another or "either recognizes or should recognize that it is likely to do so, an (d) knows that the statement is false or acts in reckless disregard of its truth or falisity". *Dulgarian v. Stone*, 652 N.E. 2d 603, 609 (Mass. 1995).

192. (a) Publication of false statement. Here it is unquestioned that the Defendant has caused a false publication to be publically recorded at the Norfolk County Registry of Deed that purports to state that Defendant currently has absolute ownership of the title to Plaintiff's residence.

193. Further, upon conducting discovery by Plaintiff, under information and belief, it is anticipated that the balance of Defendant's purported "assignment" that currently" litters" the title to Plaintiff's property will also prove to be publications of "injurious falsehoods", that has harmed the interests of Plaintiff, which were made by Defendant with intent to harm Plaintiff's interests, and had scienter of the wrongfulness of these publications, through its practices of "robo-signing, and scienter that these purported assignments were in contravention of the clear mandates set forth in Defendant's Governing Documents.

194. (b) Harm to Plaintiff. Under information and belief, Defendant's publication of the false assertion that it is the current title holder of the Plaintiff's residence, has caused significant financial harm to the Plaintiff, by publishing injurious falsehoods related to Plaintiffs' property without having the legal ownership of the right to payment under the Plaintiffs' promissory note, or the right to enforce the power of sale in the security instrument for said promissory note. The Plaintiff through the public recordation of a document that purports to be an "assignment", but in fact is a legally inoperative record that has no significance in the transfer of title to the Lindsay real property.

195. (c) Intent of Defendant to Harm Plaintiff. Under information and belief, the Defendant intended to harm the interests of Plaintiff through its false publication,

196. Thus, based upon the above numbered paragraphs, Plaintiff has succinctly set out, and successfully pled, the specific acts by Defendant which meet the foundational elemental requirements to establish the tort of Slander of his Title by Defendant.

197. Plaintiff seeks all damages allowable in tort, or otherwise allowable by this court, for these transgressions by the Defendant.

198. Plaintiff will prove damages at trial.

## Count V – Wrongful Foreclosure

199. Plaintiff repeats and realleges all paragraphs above as if set forth fully herein.

200. Under G.L. c. 244 § 14, the non-judicial foreclosure process in this matter began at the time of the Defendant Trustee's first publication of the auction sale of the Lindsay residence.

201. As discussed above, the Defendant Trustee did not have legal standing to enforce the contractual right of the power of sale clause in the Plaintiff's mortgage contract that he only granted to New Century Mortgage Corporation.

202. Thus the Defendant Trustee has initiated the wrongful foreclosure of the Plaintiff's residence based upon the Defendant Trustee's non-existent contractual right to enforce the Plaintiff's mortgage contract.

203. The Plaintiff's claim does not solely sound in Tort

204. Plaintiff retains the right of redemption under G.L. c. 244 § 18, and states that any future auction of his residence by the Defendant Trustee will not sever his statutory right of redemption as he is clearly challenging the Defendant Trustee's standing to enforce non-existent contractual rights in his mortgage contract.

205. Upon any subsequent auction by the Defendant Trustee, this count will fully ripen into a challenge to the foreclosure auction sale itself by an entity that lacks the legal standing to sever his statutory right of redemption.

206. Plaintiff seeks all damages allowable in tort, equity, or otherwise allowable by this court, for these transgressions by the Defendant.

207. Plaintiff will prove damages at trial.

WHEREFORE, the Plaintiff respectfully requests:

a. That this Court grant the Plaintiff's requested injunctive relief, as the balance of hardships clearly tip in his favor, the Defendant is not harmed by said delay, and the Plaintiff has a substantial likelihood of being successful on the merits of the instant complaint.

b. That this Court award Plaintiff reasonable attorneys and expert fees, and damages pursuant to G.L. c. 93A.

c. That this Court award Plaintiff reasonable attorneys and expert fees, and damages pursuant to his claims related to wrongful foreclosure and slander of title..

d. That this Court issue other such further and additional relief as it deems appropriate and just.

Respectfully submitted,
Plaintiff,
Robert Lindsay
By his Attorney

Glenn F. Russell, Jr.
BBO# 656914
38 Rock Street, Suite #12
Fall River, MA 02720
(508) 324-4545
russ45esq@gmail.com

Dated: June 11, 2012

CERTIFICATE OF SERVICE

I, Robert Lindsay. hereby certify that on June 11, 2012, I served a true copy of the foregoing Verified Complaint on the Defendant through a process server, and a courtesy copy upon the Defendant's attorney, listed below; who has been the continued counsel of record in this matter.

Glenn F. Russell, Jr.

Maranosci Law Group
1350 Division Road,
Suite 301
West Warwick, RI 02893

VERIFICATION

VERIFICATION

I, Robert Lindsay, being duly sworn depose and state that we have read a copy of this Amended Verified Complaint, and have read the facts and statements contained and hereby attest that the facts and statements contained in this Complaint are true to the best of my knowledge and belief, and that I have not omitted any material facts herein, on this the 6th day of June, 2012.

Robert Lindsay

# EXHIBIT

# A

16

2006 00126993
Bk: 40672 Pg: 326 Doc: MTG
Page: 1 of 16 11/01/2006 10:07 AM

15 Dawson St Dorchester

Return To:

New Century Mortgage Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

Prepared By:

New Century Mortgage Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

[Space Above This Line For Recording Data]

# MORTGAGE

MIN 100488910104261218

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated October 31, 2006 , together with all Riders to this document.
(B) "Borrower" is ROBERT LINDSAY

Attested hereto
Francis M. Roache
Register of Deeds

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is New Century Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of California
Lender's address is 18400 Von Karman, Suite 1000, Irvine, CA 92612

(E) "Note" means the promissory note signed by Borrower and dated October 31, 2006.
The Note states that Borrower owes Lender TWO HUNDRED TWENTY-FOUR THOUSAND AND 00/100 Dollars
(U.S. $224,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than 11/01/2036.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used



RHL.

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the County of Suffolk:

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]:

See Legal Description Attached Hereto and Made a Part Hereof

Parcel ID Number: 16-2908 which currently has the address of
15 DAWSON STREET [Street]
BOSTON [City], Massachusetts 02124 [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged. such Miscellaneous Proceeds shall be applied to restoration or repair of the Property. if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction. provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds. Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument. whether or not then due. with the excess. if any. paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking. destruction. or loss in value of the Property. the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument. whether or not then due. with the excess. if any. paid to Borrower.

In the event of a partial taking. destruction. or loss in value of the Property in which the fair market value of the Property immediately before the partial taking. destruction. or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction. or loss in value, unless Borrower and Lender otherwise agree in writing. the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction. or loss in value divided by (b) the fair market value of the Property immediately before the partial taking. destruction. or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking. destruction. or loss in value of the Property in which the fair market value of the Property immediately before the partial taking. destruction. or loss in value is less than the amount of the sums secured immediately before the partial taking. destruction, or loss in value, unless Borrower and Lender otherwise agree in writing. the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower. or if. after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages. Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument. whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal. is begun that. in Lender's judgment. could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and. if acceleration has occurred. reinstate as provided in Section 19. by causing the action or proceeding to be dismissed with a ruling that. in Lender's judgment. precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

(Seal)
ROBERT LINDSAY -Borrower

(Seal)
-Borrower

(Seal)
-Borrower

(Seal)
-Borrower

(Seal)
-Borrower

(Seal)
-Borrower

(Seal)
-Borrower

(Seal)
-Borrower

COMMONWEALTH OF MASSACHUSETTS, Suffolk County ss:

On this 31 day of October 2006, before me, the undersigned notary public, personally appeared

Robert Lindsay

proved to me through satisfactory evidence of identification, which was/were MA DL ; to be the person(s) whose name(s) is/are signed on the preceding document, and acknowledged to me that he/she/they signed it voluntarily for its stated purpose.

My Commission Expires:

(Seal)

TODD M. GORNSTEIN MY COMM. EXPIRES MAY 22, 2009 COMMONWEALTH OF MASSACHUSETTS NOTARY PUBLIC

Notary Public

# EXHIBIT

# B